## STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Petitioner,

### v.

### Asa DOWDY and Barbara Dowdy, Respondents.

### No. S–10946.

Supreme Court of Alaska.

April 22, 2005.

---

Paul W. Waggoner, Law Offices of Paul Waggoner, Anchorage, for Petitioner.

Jonathon A. Katcher, Pope & Katcher, Anchorage, for Respondents.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

## I. INTRODUCTION

In this petition for review, we address whether an arbitrator should decide two dis-puted insurance coverage issues. This matter arises in the context of an insurance policy's arbitration clause that provides for arbitration by written request of the insured or the insurer as to either of two questions: (1) "Is the insured legally entitled to collect damages from the owner or driver of the uninsured vehicle or under insured motor vehicle"; and (2) "if so, in what amount?"

Barbara and Asa Dowdy requested arbitration of their negligent infliction of emotional distress (NIED) and loss of society claims, including the question whether they were covered under the policy. The trial court granted the Dowdys' motion to stay the judicial proceedings and referred the matter to arbitration. State Farm filed a petition for review, which we granted. We hold that the coverage issues do not fall within the policy's arbitration clause and are not inextricably intertwined with issues of liability and damages committed to arbitration under the policy. We therefore reverse the trial court's decision to refer the policy coverage issues to arbitration.

## II. FACTS AND PROCEEDINGS

On September 30, 2000 at 3:00 p.m., Kirk Jackson, driving with a blood alcohol content of at least .292, crossed over the centerline of the road and caused a head-on collision with seventeen-year-old Heather Dowdy.[1] Troopers contacted Heather's mother, Barbara Dowdy, at 5:00 p.m. and informed her that Heather was in a serious accident. Barbara Dowdy went to Fairbanks Memorial Hospital and waited in the chapel until she was informed by a doctor at 6:20 p.m. that her daughter had died. During the three and one-half hours, the doctors had performed a series of medical procedures on Heather, including intubating, ventilating, abdominal surgery, shaving her skull, drilling a hole in her skull, and using an electrical saw on her skull. Barbara Dowdy first saw and identified her daughter after she had died. In her affidavit she states:

> I remember screaming and shouting and I lost all rationality. . . . I lost track of time

---

1. For purposes of the petition for review, we take as true the facts asserted by the Dowdys.

and space.... I was in such a state of shock that I was unable to operate a telephone to call my daughter Jennifer to tell her of Heather's death. My hands were shaking so strongly that I could not operate the buttons on the phone. I was crying so hard that I could not see the buttons through my tears. I was so disoriented that I could not remember Jennifer's phone number of many years. After the phone call I could not remember how to get back to the room where Heather was.... I had to be physically supported in order to walk back to Heather's room.... I continue to have problems with my short term memory since seeing Heather in the hospital.

Heather's father, Asa Dowdy, learned of the accident at 8:00 p.m. and rushed to the hospital. He was told that Heather had died and then saw his daughter. He describes his emotional response in his affidavit:

I started to cry and I physically felt a painful change in my chest as if there was a hole in my heart. I continued to feel this physical pain in my chest for five or six weeks after seeing Heather in the hospital. When I saw [her] ... I felt a weakness in my body that forced me to sit down. I wept.

The Dowdys assert that Heather died as a result of Jackson's reckless and outrageous conduct, and that they suffered negligently inflicted emotional distress and the loss of society of their minor child.

Jackson was insured by Allstate, which paid one $50,000 liability policy limit, plus add ons, to the Estate of Heather Dowdy to settle its claims for wrongful death, and one $50,000 liability policy limit, plus add ons, to the Dowdys to settle their claims for NIED, loss of society, and punitive damages.[2]

The Dowdys had three State Farm policies, each of which included underinsured motorist (UIM) policy limits of $100,000 per person/$300,000 per accident. State Farm paid the Estate of Heather Dowdy three $100,000 UIM per person policy limits plus add ons. The Dowdys claim that there are separate limits available for NIED, loss of consortium, and punitive damages. They assert that State Farm should pay each of them a separate $100,000 UIM per person policy limit, for a total of $200,000 plus add ons. The Dowdys also maintain that their claims must be adjudicated by arbitration pursuant to the following arbitration agreement in their State Farm policy:

**Deciding Fault and Amount—Coverages U and U1**

Two questions must be decided by agreement between the *insured* and us:

1. Is the *insured* legally entitled to collect damages from the owner or driver of the *uninsured motor vehicle* or *underinsured motor vehicle;* and

2. If so, in what amount?

If there is no agreement, these questions shall be decided by arbitration....

State Farm filed a declaratory judgment on July 12, 2002 to establish the rights of the parties under the State Farm policy. On January 2, 2003, Superior Court Judge Niesje J. Steinkruger granted the Dowdys' motion to stay judicial proceedings and referred the matter "to arbitrators to resolve all factual and legal issues arising from this dispute." State Farm filed this petition for review.

## III. DISCUSSION

State Farm argues that the disputed coverage issues in this case should not be arbitrated because the public policy in favor of developing precedent and maintaining uniformity in decision making requires judicial determination of coverage issues. State Farm also contends that its insurance policy's arbitration clause does not submit the disputed

---

**2.** The Dowdys assert their NIED claim under *Beck v. State,* 837 P.2d 105, 109–11 (Alaska 1992), their loss of society claim under *Gillispie v. Beta Constr. Co.,* 842 P.2d 1272 (Alaska 1992), and their punitive damages claim under *State Farm Mut. Auto. Ins. Co. v. Lawrence,* 26 P.3d 1074, 1079–81 (Alaska 2001). This petition for review requires that we consider whether the claims should be arbitrated or judicially tried, not to assess the merits of the liability claims. The parties' arguments regarding the merits of their claims, therefore, will be addressed only to the extent that they are relevant to determining whether or not the coverage claims should be arbitrated.

coverage issues to arbitration. The Dowdys respond that all issues should be arbitrated because the central coverage question, whether they suffered "bodily injury" in the "same accident" as their daughter, is inextricably intertwined with issues of liability and amount of damages that the policy commits to arbitration. The Dowdys also argue that they will endure excessive delay if they are forced to wait for adjudication of coverage issues before they can present their testimony to arbitrators. We will proceed to consider the parties' arguments following our statement of the standard of review.

## A. Standard of Review

■ Whether a dispute is arbitrable is a question of law that we will review de novo.[3] On questions of law, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[4]

## B. The Coverage Matters at Issue in this Case

■ We first consider our previous decisions on the issue of separate "per person" limits for NIED and loss of society claims to provide a context for understanding the matters of coverage particular to this case. Although we have not yet defined conclusively the parameters for these claims, we addressed the question whether NIED claims qualify for separate policy limits in *State Farm Mutual Automobile Insurance Co. v. Lawrence.*[5] In *Lawrence*, the phrasing of the coverage provided by the UIM policy for bodily injury was identical to that in the Dowdys' policy.[6] We determined that under such a policy two requirements must be met

in order for the victim's parents to be eligible for separate policy limits: The parents must demonstrate that (1) they suffered "bodily injury"; and (2) they were injured "in the same accident" as the victim.[7] We did not ultimately assess whether the Lawrences had met these requirements because we determined that State Farm had waived both the issue of whether the emotional distress claimed by the parents constituted "bodily injury" and the issue of whether the parents had been "in the same accident" as their child.[8]

The issue of separate policy limits for loss of consortium also arose in *Wold v. Progressive Preferred Insurance Co.*[9] in connection with the question whether liability coverage had been exhausted. Heidi Wold, a passenger in Kirby Smith's car, lost her life in an accident that occurred when Smith swerved to avoid an oncoming vehicle in his lane of traffic. The Wold parents wanted to recover underinsured motorist benefits from their insurer, Progressive. Progressive denied such coverage on the basis that the liability coverage under Smith's policy with Allstate had not yet been exhausted because the Wolds' claim for loss of consortium had triggered separate "per person" policy limits under the Allstate policy.[10]

In *Wold*, we decided that it was unnecessary to resolve definitively whether a loss-of-society claim should trigger separate "per person" coverage because Progressive and Allstate both viewed "a claim for loss of consortium or society—as opposed to a claim for NIED—as a derivative claim that would not trigger a separate 'per person' Allstate

---

3. *Ahtna, Inc. v. Ebasco Constructors, Inc.,* 894 P.2d 657, 660 (Alaska 1995).

4. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

5. 26 P.3d 1074 (Alaska 2001).

6. The policies each state as follows:
   Under "Each Person" is the amount of coverage for all damages due to *bodily injury* to one *person.* "*Bodily injury* to one *person* " includes all injury and damages to others resulting from this bodily *injury.* Under "Bodily Injury— Each Accident" is the total amount of coverage, subject to the amount shown under "Each Person", for all damages due to *bodily injury* to two or more *persons* in the same accident. *Id.* at 1077.

7. *Lawrence,* 26 P.3d at 1077 (citing *Crabtree v. State Farm Ins. Co.,* 632 So.2d 736, 745 (La. 1994)).

8. *Id.* at 1077.

9. 52 P.3d 155, 166 (Alaska 2002).

10. *Id.* at 157.

policy limit." [11]   Because both parties agreed on the proper treatment of the claim it was unnecessary for us to rule on the question of whether separate "per person" policy limits should generally apply to loss of consortium.[12]   In a footnote to the opinion, we recognized that

> the issue may not be amenable to a definitive resolution, since much of the case law cited by the parties in their supplemental briefing seems to suggest that whether a loss-of-society claim should trigger separate "per person" coverage may hinge more on a particular policy's definition of the scope of its bodily injury coverage than on the inherent nature of a cause of action for loss of society.[13]

An added layer of complexity in determining these coverage issues, therefore, is that many variations exist in policy language and scope.   As our footnote in *Wold* suggests, these variations may prevent the court from making a broad or general determination as to whether separate policy limits apply and may require a specialized analysis of the policy language in question.[14]

### C.   The State Farm Insurance Policy Does Not Commit the Disputed Coverage Issues to Arbitration.

■   By its terms, the State Farm arbitration clause does not include the disputed coverage issues in this case.   The policy language commits two questions to arbitration:

1.   Is the *insured* legally entitled to collect damages from the owner or driver of the *uninsured motor vehicle* or *underinsured motor vehicle;* and

2.   If so, in what amount?

By focusing on the insured's right "to collect damages *from the owner or driver* " (emphasis added), the arbitration clause unambiguously excludes questions relating solely to the right to collect *from the insurer.*[15]   Here, the disputed coverage claims involve the Dowdys' right to recover from State Farm, not from the owner or driver of the vehicle. The language of the policy therefore does not submit the disputed coverage issues to arbitration.[16]

The Dowdys assert that their claim should nevertheless be arbitrated because the coverage matters in question are inextricably intertwined with the issues of fault and damages committed to arbitration under the policy.   They also argue that if the coverage issues are not arbitrated they will confront hardship due to delays associated with adjudication.   We address each of these contentions below.

### D.   Although Undue Delay Due to Bifurcation Is a Valid Concern, It May Be Addressed Through an Alternative Approach.

The Dowdys argue that if the coverage matters involved in this case are not arbitrat-

---

**11.**  *Id.* at 166.

**12.**  *Id.*

**13.**  *Id.* at 166 n. 36. In the footnote that followed, we also commented that

> [b]ecause we have limited our decision to the propriety of allocating the Wolds' loss-of-society settlement to separate "per person" limits under the Allstate policy, we express no view as to the proper handling of these individual claims under the specific terms of Progressive's UM/UIM policy—an issue that the parties have not addressed and that we think should properly remain open for consideration by the superior court in the first instance, if it arises.

> *Id.* at 166 n. 37.

**14.**  *Id.* at 166 n. 36. The suggestion that the superior court should first consider these coverage issues under the Progressive policy alludes to the need for courts to decide this issue, however, because a request for arbitration was not at issue, it may not be fair to conclude that this statement favored court adjudication over arbitration.

**15.**   *Cf. United Servs. Auto. Ass'n v. Turck,* 156 N.J. 480, 721 A.2d 1, 4–6 (1998) (holding coverage questions arbitrable where policy committed to arbitrator disputes over whether "a covered person ... is legally entitled to recover damages under this endorsement" but suggesting that coverage questions would not be arbitrable where policy limits arbitration to disputes over whether the insured "is legally entitled to recover damages from the owner or operator of an uninsured highway vehicle").

**16.**   We do not reach State Farm's alternative argument that public policy considerations favor judicial determination of disputed coverage issues.

ed they will have to endure excessive delay. The Dowdys point out that in *Lawrence,* which also involved NIED and loss of society coverage claims, the bifurcated case took almost seven years to finally resolve. The Dowdys maintain that if they are forced to wait for the superior court's resolution of their case and the likely Alaska Supreme Court appeal, they will not be able to put the terrible event of their daughter's death behind them for several more years. They argue that "[o]ut of respect for [their] grief the court should allow them to promptly present to the arbitrators their testimony about the terrible ordeal of September 30, 2000."

■ The Dowdys are correct in their assessment of the delaying effects of court adjudication of coverage issues before arbitration of liability and damages. But commentators have recognized an alternative approach that addresses this problem of delay. For example, in his treatise, *Uninsured and Underinsured Motorist Insurance,* Professor Alan Widiss suggests that courts should have flexibility in determining the order of bifurcated proceedings:

> There seems to be little, if any, reason why coverage issues—which insurers insist on resolving within the judicial system—must or should be decided first. To the extent that arbitration in fact provides an efficient and expeditious resolution process, it seems preferable to pursue that adjudication first.[17]

We agree with Professor Widiss that in some cases it may be preferable to allow arbitration to precede adjudication of coverage issues. Application of such an approach could allow plaintiffs to be heard on the adjudicated factual issues on a more expedited basis. We leave discretion to trial courts to allow arbitration of liability and damages to proceed before or even concurrently with court adjudication of coverage in order to alleviate concerns regarding delay.

### E. The Policy Coverage Issues Are Not Inextricably Intertwined with Issues of Fault and Liability in this Case.

■ The Dowdys also contend that the policy coverage issues are inextricably intertwined with the issues of fault and liability committed by contract to arbitration. They argue that an arbitrator should therefore decide all these issues together.

Several courts have determined that arbitration is appropriate where underinsured motorist coverage questions are inseparable from issues of fault and damages included in the policy's arbitration clause.[18] A number of other courts considering arbitration policies in the context of business contracts have determined that arbitration is necessary when nonarbitrable claims are inseparable from arbitrable matters.[19] These cases help persuade us that coverage matters not committed to arbitration by the terms of the policy should nevertheless be arbitrated where they are inextricably intertwined with matters committed by contract to arbitration. Where the findings committed to the arbitrator would decide the coverage question, then the coverage question should be subject to arbitration.

The Dowdys' NIED and loss of society claims are not inextricably intertwined with the policy coverage issues. To prevail before

---

**17.** 2 ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 24.6, at 403 (Rev.2d ed. 2000).

**18.** *See Klimek v. Horace Mann Ins. Co.,* 14 F.3d 185, 188 (2d Cir.1994); *Rocca v. Pennsylvania Gen. Ins. Co.,* 358 Pa.Super. 67, 516 A.2d 772 (1986); *see also* 1 MARTIN DOMKE, DOMKE ON COMMERCIAL ARBITRATION § 13:12 (Gabriel M. Miller rev. ed., 2003) ("Under a standard clause that authorizes arbitration if the parties disagree as to the insured's legal entitlement to recover damages from the owner or operator of an uninsured motor vehicle, disputed damage questions may implicate the question of the insured's duty to provide underinsured motorist coverage.... In

other words, the issues of coverage and damages may be so inextricably intertwined that the entire dispute will fall within the scope of the arbitration clause. In such a case, the preliminary question of coverage is subject to arbitral resolution.") (citing *Klimek,* 14 F.3d at 187).

**19.** *See Harvey v. Joyce,* 199 F.3d 790, 795–96 (5th Cir.2000). The federal courts have further determined that nonsignatories may compel a signatory to arbitrate under an estoppel theory if the claims are "intimately founded in and intertwined with the underlying contract obligations." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995) (citation omitted).

the arbitrator on their NIED sensory observation claims, the Dowdys must show that (1) the defendant negligently caused injury to a close relative, (2) the plaintiffs experienced shock as the result of a sudden sensory observation of the relative's injuries more or less contemporaneously with learning of the nature of the victim's injury, and (3) the harm suffered was severe, but need not have resulted in physical illness or injury.[20] To prevail on their parental loss of society claim, the Dowdys must show that the defendant negligently caused the injury or death of their child and that they suffered mental distress as a result.[21] The coverage issues raised by both the NIED and loss of society claims center on whether the Dowdys suffered "bodily injury" and whether they were injured "in the same accident" as their daughter under the terms of the policy.[22]

The arbitrator's determination of fault and liability will not necessarily resolve the coverage issues in this case. The meaning of "in the same accident" under the policy is a coverage question that is clearly distinct from the determinations to be made by the arbitrator. Because neither the NIED nor the loss of society claims require a showing of physical injury, it is not necessary for the arbitrator to determine whether the Dowdys suffered "bodily injury." The coverage issues are therefore not inextricably intertwined with the fault and liability questions to be arbitrated.

If the arbitrator finds liability on either or both claims, the assessment of damages may, but need not, include findings regarding whether the Dowdys suffered various physical symptoms alleged in their affidavits. Although whether the Dowdys suffered "bodily injury" under the policy remains a question for the court, the court should give collateral estoppel effect to fact determinations made by the arbitrator and these determinations, if made and necessary to the issues properly before the arbitrator, can serve to establish the underlying facts on which the court must base its coverage determination.[23]

## IV. CONCLUSION

We hold that the disputed coverage issues do not fall within the ambit of the policy's arbitration clause and that these coverage questions are not inextricably intertwined with the fault and liability issues committed to arbitration under the policy. We therefore REVERSE the trial court's order to refer the policy coverage issues for resolution by an arbitrator. On remand, the superior court has the discretion to allow arbitration of liability and damages to proceed before or even concurrently with court adjudication of the coverage issues to alleviate concerns regarding delay.

---

**20.** *See Mattingly v. Sheldon Jackson Coll.,* 743 P.2d 356, 365 (Alaska 1987) (noting requirement that plaintiff and victim be closely related and that shock must follow closely on heels of accident); *Chizmar v. Mackie,* 896 P.2d 196, 201–04 (Alaska 1995) (noting that physical injury is not required for NIED sensory observation claims like that recognized in *Mattingly*).

**21.** *Gillispie,* 842 P.2d at 1273–74.

**22.** *Lawrence,* 26 P.3d at 1077.

**23.** The *Restatement of Judgments* establishes several requirements to give preclusive effect to arbitral decisions, including adequate notice to persons who are to be bound by the decision. While today's decision puts the parties on notice that the arbitrator's factual determinations will be given preclusive effect later in court, such effect would be appropriate only if the arbitration meets the other elements of fair adjudication. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 83(2) (1982) (listing criteria necessary to grant preclusive effect to quasi-judicial decisions).